UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD THOMPSON,

                                    Plaintiff,

            v.                                          7:10-CV-1085
                                                        (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

LAWRENCE D. HASSELER, ESQ., for Plaintiff
DENNIS J. CANNING, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.      PROCEDURAL HISTORY

        Plaintiff filed[1] an application for disability insurance benefits on March 4, 2008,

claiming disability since January 1, 2004.  (Administrative Transcript (T.) at

104–108).  Plaintiff's applications were initially denied on June 3, 2008, and plaintiff

---

[1] In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively
filed" his application on November 23, 2007.  (T. 11).  When used in conjunction with an
"application" for benefits, the term "protective filing" indicates that a written statement, "such
as a letter," has been filed with the Social Security Administration, indicating the claimant's
intent to file a claim for benefits.  *See* 20 C.F.R. § 416.340.  There are various requirements for
this written statement.  *Id.*  If a proper statement is filed, the Social Security Administration will
use the date of the written statement as the filing date of the application even if the formal
application is not filed until a future date.

requested a hearing before an ALJ.  (T. 56–61).  The hearing, at which plaintiff

testified, was conducted on December 29, 2009.  (T. 24–53).

In a decision dated January 28, 2010, the ALJ found that plaintiff was not

disabled.  (T. 8–23).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

September 2, 2010.  (T. 1).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following claims:

1.    The ALJ failed to give proper weight to the opinions of plaintiff's treating
      physicians.  (Pl.'s Mem. at 10–13).

2.    The ALJ failed to properly apply the special technique for evaluating
      mental impairments.  (Pl.'s Mem. at 13–18).

3.    The ALJ failed to properly assess the plaintiff's allegations of disabling
      symptoms.  (Pl.'s Mem. at 18–20).

4.    The ALJ erred in finding plaintiff could return to his past relevant work.
      (Pl.'s Mem. at 20–24).

For the reasons set forth below, the court affirms the ALJ's findings.

## III.   APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he is "unable to engage in any substantial

gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.

3

However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   MEDICAL EVIDENCE

Plaintiff's medical records show that he received psychiatric treatment from January 2000 through December 2009. (T. 193–347). On January 20, 2000, plaintiff, then a postal worker, was admitted to an inpatient psychiatric program at South Oaks Hospital. (T. 199–200). He was hospitalized until January 28, 2000. The discharge summary from the inpatient hospitalization states that plaintiff was admitted because he felt like he was a "time bomb waiting to explode and to go berserk." (T. 199). He was angry because he could only see his family on weekends and felt that people wanted to electrocute or poison him. *Id.* Plaintiff reported that his supervisor was deceitful and a liar, and plaintiff stated that he would kill or "take out" his supervisors if they prevented him from commuting to see his family. (T. 199). However, plaintiff

had only an antique long rifle that did not work and a BB-gun.  *Id.*

The discharge summary stated that plaintiff did well with medication[2] and daily psychotherapy.  Plaintiff was treated by Dr. Harold Lasker, M.D., who stated that plaintiff's condition on discharge was "Improved."  At the time of discharge, plaintiff was in good contact with reality, not dangerous to himself or others, voiced no complaints, and showed no side effects.  Dr. Lasker stated that plaintiff was "fit to return to work."  (T. 199).  Plaintiff's diagnoses were bipolar disorder with psychosis, alcohol abuse, and impulse control disorder.  (T. 200).

On January 28, 2000, upon discharge from the hospital, plaintiff was admitted to a "partial hospital program" at South Oaks Hospital and stayed in that program until February 8, 2000.  (T. 197–98).  During this program, plaintiff attended self-help groups and continued to see Dr. Lasker.  (T. 200).  Plaintiff did well in the program. *Id.*  He was compliant with his medications, talkative, and admitted that, although he was angry at his supervisors, he would not hurt or kill them.  At the time of plaintiff's discharge on February 8, 2000, Dr. Lasker stated that plaintiff's prognosis was "fair to good," so long as he remained compliant with his treatment.  (T. 198).  During the inpatient and the partial hospitalization program, plaintiff's Global Assessment of

---

[2] Plaintiff took Lithianate, Zoloft, Trifluoperazine, Ativan, Serax, Neurontin, and Haldol during his stay in the hospital. (T. 199).

6

Functioning[3] (GAF) score went from 25 on admission to 50.  (T. 200).  When plaintiff was discharged from the partial hospitalization program, his GAF was 70, and his condition on discharge was "Improved."  (T. 197).

Plaintiff received most of his subsequent treatment at the Lewis County Community Health Center (LCCHC) from several physicians, including Dr. Pankaj Kishore, Dr. Sagarika Narangoda, Dr. Joyce Sudeall, Dr. Aflatoon Shafaie, and Dr. Seymour Leven.  (T. 201–51; 303–39).

Dr. Kishore treated plaintiff from 2001 through February 2004.  (T. 218, 221–226).  On January 22, 2001, Dr. Kishore stated that plaintiff did not present a clear history of manic and depressive symptoms, but that the plaintiff had reported that he had paranoid beliefs and bipolar disorder.  (T. 203–04).  Dr. Kishore continued the diagnosis of bipolar disorder, pending further information, and continued plaintiff's prescription for Lithium Carbonate.  *Id.* On November 23, 2001, Dr. Kishore noted that plaintiff's psychotic symptoms were worsening, and he prescribed Risperdal.  (T. 223).  On May 29, 2002, Dr. Kishore noted that plaintiff was "doing well" and had not been having any significant depression.  (T. 225).

Plaintiff did well throughout the rest of 2002, despite different stressors, and in

---

[3] The GAF is a scale that indicates the clinician's "judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text revision 2000) (DSM-IV-TR).  The GAF scale ranges from 0 to 100; GAF scores from 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school situations, but the individual is generally functioning well and has some meaningful interpersonal relationships.  DSM-IV-TR at 34.

August 2003, Dr. Kishore noted that plaintiff had adjusted well to working as a truck driver, had no symptomatic relapse, and did not seem to be getting paranoid.  (T. 225–26).  Dr. Kishore noted, on February 11, 2004, that plaintiff had adequate control over his anger, and there was no major relapse of depressive symptoms.[4]  (T. 218).

Medical records from 2004 and 2005 indicated that plaintiff was stable and responding well to a decrease in his Risperdal dosage.  (T. 206–213).  On August 9, 2005, Dr. Joyce Sudeall assigned plaintiff a GAF score of 65 and said that plaintiff offered "no complaints."  (T. 212).  She also noted that plaintiff's mood was euthymic, and his insight and judgment were fair.  *Id.*  However, on November 3, 2005, Dr. Sudeall reported that plaintiff was "filled with complaints," and "even though [plaintiff's] medications are at the therapeutic range, he continues to be unhappy, grandiose, and with poor insight and judgment."  (T. 213).

Two months later, plaintiff began to see Dr. Sagarika Narangoda, who provided regular psychiatric care through 2009.  (T. 214–17, 227–50, 304–47).  Dr. Narangoda's January 3, 2006, report stated "no evidence of psychosis," and "no evidence of exacerbation of bipolar mania or depression."  (T. 214).  Dr. Narangoda's notes through 2006 do not mention any additional diagnoses and repeatedly state "no evidence of psychosis, mania or depression."  (T. 214–17, 227–30).  Dr. Narangoda's notes through 2007 indicate that plaintiff was doing well and was stable.  (T. 231–46).

---

[4] Plaintiff's alleged onset of disability was January 1, 2004.  (T. 104).

In early 2008, Dr. Narangoda described plaintiff as "pleasant and cooperative," his dress was casual and appropriate, his mood was euthymic, and plaintiff had "no complaints," other than financial difficulties. (T. 248–50; *see also* T. 304–13). Dr. Narangoda noted that plaintiff was experiencing multiple stressors on August 8, 2008, but did not change plaintiff's medication. (T. 315). One month later, on September 5, 2008, Dr. Narangoda indicated that plaintiff was doing well, with no major stressors, and continued plaintiff's prescriptions. (T. 316). In notes from December 9, 2008, Dr. Narangoda noted that plaintiff's main stressor was financial difficulty, but he had no symptoms suggestive of mania, depression, or psychosis. (T. 322–23).

Dr. Jeanne Shapiro conducted a consultative evaluation of plaintiff on May 20, 2008. (T. 252). Dr. Shapiro reported that plaintiff "does not report any significant anxiety symptoms or symptoms of a formal thought disorder." (T. 253). Plaintiff told Dr. Shapiro that he was able to work at that time "a little bit depending on what the job is [and] the people I have to work with." (T. 252). She concluded that his psychiatric symptoms "may interfere with his functioning at times," and recommended that plaintiff be referred to a clinical psychologist for more comprehensive treatment. *Id.*

Dr. Maria Morog, a non-examining, state psychology consultant, reviewed plaintiff's file on May 24, 2008, and determined that plaintiff had mild difficulties carrying out activities of daily living and maintaining concentration, and moderate difficulties maintaining social functioning. (T. 257). Dr. Morog determined that

plaintiff could sustain a normal work day and a normal work week.  (T. 273).  Dr. Morog noted that plaintiff might have difficulties responding appropriately to supervisors and coworkers, and might have difficulty dealing with the public, but determined that plaintiff could adapt to changes in a routine work setting and make simple work-related decisions, if he were not working in close proximity to others.  (T. 273).

On January 7, 2009, plaintiff was seen by Dr. Seymour Leven, who wrote that plaintiff demonstrated a mood that was "generally euthymic."  (T. 324).  Dr. Leven also stated that plaintiff appeared to be "functioning satisfactorily within the bounds of a minimal but adequate income from active retirement sources."  (T. 325).

Dr. Narangoda's March 4, 2009 notes indicate that overall, plaintiff was doing well, with "no symptoms of mania or psychosis."  (T. 328).  Plaintiff reported only one day of mild depression in May of 2009.  (T. 334).  On August 5, 2009, Dr. Narangoda indicated that plaintiff continued to have major financial stressors, but was doing well.  (T. 338).

On December 15, 2009, just two weeks before plaintiff's hearing with the ALJ, Dr. Narangoda filled out a form—"Complete Medical Report (Mental)."  (T. 344–47).  On this form, Dr. Narangoda stated that plaintiff was "unable to work or perform work-related activities," although Dr. Narangoda also noted that plaintiff was "stable on current medications—with some limitations."  (T. 344).  Dr. Narangoda checked

boxes on the form, stating that plaintiff had "marked" limitations in his ability to: make judgments on simple work-related decisions, understand and remember complex instructions, interact appropriately with the public, supervisors, and coworkers. (T. 345–46). Dr. Narangoda further indicated that plaintiff had an "extreme" limitation in his ability to respond appropriately to changes in a routine work setting. (T. 346).

## V. TESTIMONY and NON-MEDICAL EVIDENCE

Born on January 14, 1956, plaintiff was 53 years old at the time of the ALJ's hearing. (T. 27). Plaintiff testified that he earned a GED, after which he entered the army, where he received training as a mechanic and as a photographer. (T. 27–28). Plaintiff testified that he served in the National Guard until he retired in 2000, and worked for the U.S. Postal Service from 1980 until 1998. (T. 28–29).

Plaintiff testified that he worked for an excavation company as a truck driver during the spring and summer of 2002 and 2003. (T. 30, 38). He obtained a commercial trucking license after attending a training school in 2002. (T. 46). Plaintiff testified that he had quit working as a truck driver by mid-2004. (T. 30).

Plaintiff testified that for several months between 2005 and 2006, he worked part-time as a grocery store stocker. (T. 30–31). He could not remember whether he worked in 2007, but he testified that the only jobs he remembered working after he retired from the Post Office and National Guard were as a truck driver and a grocery store stocker. (T. 31). At the time of the hearing, plaintiff testified that he was not

11

working and was living with the income he received for disability retirement from the Postal Service.  (T. 28).

At the time of the hearing, plaintiff testified that he was taking his medications as prescribed, but was still experiencing symptoms of depression.  (T. 51–52).  This depression prevented him from engaging in hobbies or work around his house.  (T. 49–52).  Plaintiff testified that he got depressed "a lot," and that his periods of happiness were short.  (T. 52).

On a typical day, plaintiff testified that he would get up around 10 or 11 a.m., "mope" or "lounge" around his house, and that he usually did not eat breakfast or lunch, only dinner.  (T. 43).  Plaintiff testified that he might repair a couple little things around the house or help his wife out with the cleaning, like vacuuming.  (T. 44).  Plaintiff testified that his wife did all of the cooking.  (T. 43–44).  Plaintiff testified that sometimes he would use his computer for a couple of hours and go on the internet to look up recipes and check email, and perhaps he would also watch some television.  (T. 44).  Plaintiff testified that he would go to bed around 11 or 12 at night.  (T. 42).  Plaintiff also testified that because his wife does not drive, when she or her mother-in-law are ill, plaintiff drives them to and from medical appointments.  (T. 45, 47).

Plaintiff testified that when he would work, he had difficulties interacting with supervisors, and also testified that he was treated poorly by coworkers and supervisors

when he worked at the Post Office.  (T. 33, 38–41).  Plaintiff testified that, while
working as a truck driver and a grocery store stocker, he could not deal with "rotten
people" because of how he had been treated in the past, and that the reason he no
longer worked at his previous jobs was because he had quit.  (T. 38–39, 41).

## VI.   ALJ's DECISION

In his January 28, 2010 decision, the ALJ found that plaintiff met the insured
status requirements of the Social Security Act through September 30, 2008.  Although
plaintiff had worked after the onset of the alleged disability, the ALJ determined that
plaintiff's work did not constitute substantial gainful activity (SGA) under the
regulations, and therefore did not deny plaintiff's claim based on his work status.  (T.
13).

The ALJ then found that plaintiff suffered from bipolar disorder, post-traumatic
stress disorder, and alcohol abuse in remission, all of which he considered "severe"
impairments under the regulations.  (T. 14).  The ALJ compared plaintiff's mental
impairments singly and in combination with the signs and symptoms listed in 20
C.F.R. Part 404, App. 1, §§ 12.04 (affective disorders) and 12.06 (anxiety-related
disorders).  (T. 14).  The ALJ concluded that plaintiff did not have a sufficient number
of "marked" impairments, nor did he have "repeated episodes of decompensation,"
which must be present to meet the criteria in the listings.  *Id.*  The ALJ concluded that
plaintiff did not have an impairment or combination of impairments that met, or

13

medically equaled, one of the listed impairments cited above.  (T. 14).

The ALJ found that plaintiff had engaged in past relevant work as a grocery store clerk and a truck driver, and had the RFC to perform a full range of work at all exertional levels.  (T. 15).  The ALJ also found that plaintiff had the mental capacity to "understand, carry out, and remember simple instructions and work-like procedures, maintain attention and concentration for at least two-hour intervals, sustain a normal workday and workweek, maintain a consistent pace, adapt to changes in a routine work setting, and use judgment to make simple work-related decisions."  (T. 15). Plaintiff was limited in that he had difficulties with supervisors, coworkers, and dealing with the public.  (T. 15, 18–19).

Although the ALJ acknowledged that plaintiff's mental impairments caused him difficulties, he found that plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with plaintiff's residual functional capacity.  (T. 15–16, 18).  The ALJ found that plaintiff experienced occasional symptoms, such as depression and anger, but his bipolar disorder was well-controlled by medication and treatment.  (T. 16).  He rejected Dr. Narangoda's opinion of total disability contained in his 2009 "Complete Medical Report (Mental)."  The ALJ found that Dr. Narangoda's 2009 statement of the severity of plaintiff's impairment was contradicted by Dr. Narangoda's previous treatment notes and other medical evidence in the record.  (T. 18–19).

14

The ALJ gave weight to Dr. Shapiro's consultative psychiatric examination, because of her "programmatic" expertise, the consistency of the examination with the medical evidence, and the fact that she examined plaintiff.  (T. 19).  Although Dr. Morog did not examine the plaintiff, the ALJ gave significant weight to Dr. Morog's report because of her "programmatic" expertise, and because the assessment was consistent with the longitudinal medical evidence.  (T. 19).

The ALJ found that plaintiff's RFC would not prevent him from returning to his past relevant work as a grocery store stocker or dump truck driver, because those jobs would allow plaintiff to limit his interactions with the public and would require minimal contact with supervisors and coworkers.  (T. 19).  Because he found that plaintiff could perform past relevant work, the ALJ concluded that plaintiff was not disabled as defined in the Social Security Act.  (T. 19).

## VII.   DISCUSSION

### A.   Treating Physician

Plaintiff contends that the ALJ should have given more weight to treating physician Dr. Narangoda's 2009 statement of plaintiff's "extreme" and "marked" limitations, and improperly gave weight to the opinion of a non-treating physician.

### 1.   Applicable Law

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical

15

findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 2.   Analysis

Plaintiff argues that the ALJ gave "no weight" to the "conclusions" of plaintiff's treating physician.  (Pl.'s Mem. at 8, 10–13).  Actually, the ALJ only gave "no weight" to Dr. Narangoda's 2009 form-report, because the report was inconsistent with other medical evidence, inconsistent with Dr. Narangoda's prior treatment notes, and with the notes of other physicians who treated plaintiff.  (T. 19).  The ALJ did give *some* weight to Dr. Narangoda's prior treatment notes and to the opinion of the consulting physician as well as the non-examining consultant because their reports were consistent with the other medical evidence.  (T. 19).

The ALJ is entitled to reject conclusions of disability made by other sources because it is the province of the Commissioner to make the determination of whether an individual is "totally disabled."  20 C.F.R. §§ 404.1527(e), 416.27(e); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  This is true even if the individual stating his

16

or her opinion of "total disability" is a medical doctor.  *Id.*; *See also Michels v. Astrue*, 297 F. App'x. 74, 76 (2d Cir. 2008).

While plaintiff certainly has some limitations, a review of the all the treating physicians' notes between 2001 and 2009 shows that plaintiff responded well to medication, and that he was able to deal with others to a limited extent.  In 2002, before plaintiff's disability onset date, but after his psychiatric hospitalization, Dr. Kishore reported that plaintiff had shown improvement in his condition; had begun work as a truck driver; was not showing psychotic symptoms; experienced no mood disturbance; was generally doing well; and had been getting along with the people for which he worked.  (T. 225).  In December of 2002, Dr. Kishore reported that plaintiff "expected to be laid off," but was handling the stress pretty well.  (T. 225).

In March of 2003, even though plaintiff had experienced an increase in irritability when he was laid off from his work, Dr. Kishore noted that plaintiff was doing well overall and was "stable."  (T. 226).  By August 6, 2003, plaintiff was working again, and Dr. Kishore stated that plaintiff had not had a symptomatic relapse, was not getting paranoid, and was "well-adjusted to his work as a truck driver."  (T. 226).  In February of 2004, Dr. Kishore reported plaintiff's diagnosis of "bipolar disorder with psychotic features, currently in remission."  (T. 218).  Dr. Kishore stated that plaintiff was not paranoid, had adequate control of his anger, and had no relapse of depressive symptoms.  *Id.*

Although plaintiff claims that his disability began in January of 2004, in June of 2004, Dr. Aflatoon Shafaie stated that plaintiff was in no distress, had "no complaints" and seemed "stable on his medication." (T. 220). On December 13, 2004, plaintiff was seen as "stable," even though one of his prescription dosages had been decreased. (T. 207). On February 22, 2005, the record indicates that plaintiff was "relaxed, well-related" and his effect was "euthymic." (T. 208). In 2005, Dr. Sudeall, stated that plaintiff "seem[ed] to be in a stable mood and functioning." (T. 210). Dr. Sudeall noted that plaintiff had recently begun a part-time job. (T. 210). Although plaintiff expressed "dissatisfaction" with his job in September of 2005, Dr. Sudeall encouraged plaintiff to continue working because it would be "good for his wellbeing [sic]." (T. 212). None of these doctors' reports is consistent with an inability to perform any substantial gainful activity, and the ALJ was entitled to rely upon these statements of plaintiff's condition.

Even reviewing Dr. Narangoda's other reports, this court finds that the ALJ's determination was supported by substantial evidence. On January 3, 2006, Dr. Narangoda stated that plaintiff was frustrated as the result of an incident that had occurred the previous week, but plaintiff did not act on his anger. (T. 214). There was no evidence of psychosis and no evidence of "exacerbation of bipolar mania or depression." (T. 214). In March of 2006, Dr. Narangoda stated that plaintiff denied any problems at work or at home, and in July and August of 2006, Dr. Narangoda

18

stated that plaintiff was doing well, and that he had been unable to find work, but had planted his own garden and was building furniture for family members. (T. 217). Plaintiff's "stressors" were financial. (T. 235). By December of 2007, Dr. Narangoda stated that plaintiff had no complaints and his mood was "bright." (T. 246). The records indicate that plaintiff continued to do well through early 2008, and Dr. Narangoda noted repeatedly that plaintiff was pleasant, cooperative, his mood was euthymic, and his affect was appropriate. (T. 247–50).

Dr. Narangoda indicated on June 6, 2008, that plaintiff continued to experience financial stressors, abut plaintiff remained pleasant and cooperative, described his mood as "okay," and his affect was appropriate. (T. 310). On August 8, 2008, plaintiff was "irritated and frustrated" due to the recent foreclosure on his house, but Dr. Narangoda noted that plaintiff did not have any suicidal or homicidal ideations, hallucinations, or delusions, and that his affect was appropriate and his cognition was intact. (T. 314). Plaintiff was feeling better a month later, and Dr. Narangoda described him as "pleasant and cooperative." (T. 316).

By December 9, 2008, Dr. Narangoda reported that plaintiff talked about having "suicidal ideations once in a while when he felt depressed," but denied having any "current intent or plan," and Dr. Narangoda remarked that plaintiff exhibited no symptoms of mania, depression or psychosis. (T. 323). By February 4, 2009, Dr. Narangoda indicated that plaintiff was "quite stable," and that he was cooperative and

19

open."  (T. 326).

Plaintiff continued to do well through July 7, 2009, and Dr. Narangoda indicated that plaintiff was pleasant and cooperative, and that his thought content was negative for suicidal and homicidal ideations, hallucinations, and delusions.  (T. 336). On August 5, 2009, Dr. Narangoda noted that plaintiff continued to have "major financial stressors," but that plaintiff was "doing well."  (T. 338).

Dr. Jeanne Shapiro consultatively evaluated plaintiff on May 28, 2008, and she indicated that plaintiff did "not report any significant anxiety symptoms or symptoms of a formal thought disorder."  (T. 243).  Plaintiff told Dr. Shapiro that he got along well with friends and family and that he enjoyed tinkering with his truck and doing housework and yard work.  (T. 255).  On May 27, 2008, psychiatric consultant Dr. Maria Morog, who did not treat plaintiff, completed a consultative evaluation and indicated that plaintiff only had "mild" difficulties carrying out activities of daily living, maintaining concentration, and maintaining social functioning.  (T. 267).  She also determined that plaintiff could sustain a normal work day and a normal work week.  (T. 273).

In contrast to the medical evidence discussed above, Dr. Narangoda's December 15, 2009 report, written just two weeks before plaintiff's hearing with the ALJ, over one year after plaintiff initially applied for disability benefits, and over one year after plaintiff's insured status expired, indicated that plaintiff was "unable to work or

perform work related activities."  (T. 344).  Dr. Narangoda's conclusory statement that plaintiff could not work is contrary to all of his earlier reports, and contrary to both the examining, consultative physician's report, and the report of the non-examining consultant.[5]  Consequently, the ALJ was entitled to give Dr. Narangoda's last report no weight, as it was "contradicted by other substantial evidence in the record," while giving his contemporaneous treatment notes, "some weight."  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

## B.    Evaluating Mental Impairments

Plaintiff argues that the ALJ did not properly complete the "special technique" for evaluating mental impairments.  Plaintiff essentially argues that the medical records reflect more severe limitations that were noted on the "Psychiatric Review Technique," dated May 27, 2008, and completed by Dr. Morog, a non-examining physician. (T. 257–74).

---

[5] Generally, the report of a non-examining agency consultant generally deserves little weight in the overall evaluation of disability.  *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990).  Such reports may be given weight only "in appropriate circumstances."  Social Security Ruling (SSR) 96-6p, 1996 WL 374180 at *3.  The weight assigned to a non-examining source depends upon the degree to which they provide explanations for their opinions.  20 C.F.R. § 404.1527(d)(3).  In this case, the ALJ began by saying that he placed more weight on Dr. Morog's opinion because of "her programmatic expertise."  (T. 19).  The ALJ made the same comment about Dr. Shapiro.  *Id.*  This reason for placing greater weight on a non-examining physician's opinion is not in the regulations; however, in this case, the non-examining physician's findings are consistent with the findings of the examining physicians, and all but the last of Dr. Narangoda's reports.  The court does note that the non-examining consultant did not see Dr. Narangoda's last report, because the consultant's report is dated May 27, 2008, while Dr. Narangoda's last report is dated in December of 2009.

### 1.    Applicable Law

The regulations "require application of a special technique at the second and third steps of the five-step framework." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted).  The reviewing authority first determines if the claimant has a "medically determinable mental impairment." *Id.* at 266 (quoting 20 C.F.R. § 404.1520a(b)(1)).  The reviewer then considers degree of functional limitation resulting from any medically determinable impairments as they pertain to four broad functional areas.  *Id.* at 266 (quoting 20 C.F.R. § 404.1520a(b)(2)).  These functional areas are: activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation.  *Id.*  (citing 20 C.F.R. § 1520a(c)(3)).

The first three of these functional areas (activities of daily living, social functioning, and concentration, persistence or pace) are evaluated with the medically determinable impairments classified as none, mild, moderate, marked, or extreme.  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  The fourth functional area (episodes of decompensation), is evaluated by indicating none, one or two, three, or four or more.  *Id.*  If the claimant's mental impairment is severe, then the reviewing authority must compare the relevant medical findings and plaintiff's limitations to the criteria of mental disorders listed in the regulations (the listings) to determine whether plaintiff's impairment matches any listed disorder. *Petrie v. Astrue*, 412 Fed. Appx. 401, 408. (2d Cir. 2011).  If not, the reviewer then determines the claimant's residual functional

capacity. *Id.*

## 2.   Analysis

The ALJ found that plaintiff's bipolar disorder, post-traumatic stress disorder, and alcohol abuse-in remission were "severe" impairments. (T. 14). The ALJ found that these severe impairments did not meet or medically equal the criteria of Listings 12.04[6] and 12.06[7], because after examining the evidence, the ALJ concluded that plaintiff had no restrictions to activities of daily living[8]; moderate difficulties in maintaining social functioning[9]; mild difficulties in maintaining concentration,

---

[6] In order to meet the criteria of Listing 12.04, plaintiff would need to have marked restriction or difficulties in two of the first three functional areas (activities of daily living, social functioning, or concentration, persistence, or pace) or repeated episodes of decompensation, a residual disease process that with a minimal increase in mental demands or a change in the environment would likely cause the claimant to decompensate, or a current history of one or more years' inability to function outside a highly supportive living arrangement. 20 C.F.R. pt. 404 app. 1 § 12.04 (B), (C).

[7] In order to meet the criteria of Listing 12.06, plaintiff would need to have marked restriction or difficulties in two of the first three functional areas (activities of daily living, social functioning, or concentration, persistence, or pace) or a complete inability to function independently outside the area of his home. 20 C.F.R. pt. 404 app. 1 § 12.06 (B), (C).

[8] Plaintiff testified that he had no physical ailments and that he could do things like operate a snow blower to remove snow from his driveway. (T. 42). Plaintiff told Dr. Shapiro that he dressed, bathed, and groomed himself, and that he could cook, clean, shop, manage money, and drive. (T. 255). Dr. Morog also concluded that plaintiff performed all his activities of daily living. (T. 273).

[9] Plaintiff told Dr. Shapiro that he got along well with his friends and family. (T. 255). Dr. Narangoda often reported that plaintiff was pleasant and cooperative during office visits. (*See, e.g.,* T. 304, 306, 308, 310, 312, 316, 319, 321, 323). On January 1, 2009, Dr. Leven described plaintiff as "friendly and engaging." (T. 324). Dr. Morog noted that plaintiff "may have difficulty responding to supervisors and coworkers appropriately and would have difficulty in dealing with the public," and thus indicated that plaintiff would have moderate limitations in his ability to interact socially. (T. 272–73).

23

persistence, or pace[10]; and only one episode of decompensation.  (T. 14–15).  Plaintiff

argues that his claims are "substantiated" by his "in-patient admission in 2000 for a

psychotic breakdown . . ." and his subsequent "consistent" complaints to his medical

providers at Lewis Community Health Center.  (Pl. Mem. at 14).  The ALJ was quite

specific in his analysis, stating that plaintiff's claim that the onset of his bipolar

disorder was in 1985 and mentioned plaintiff's hospitalization in 2000; however, the

ALJ also pointed out that plaintiff's bipolar disorder did not limit his ability to work

for at least 15 years.  (T. 16).  Plaintiff alleges disability beginning in 2004, and his

only hospitalization was in 2000; thus, the ALJ did take the history of plaintiff's

impairments and the limitations caused thereby into account.  The ALJ's analysis is

supported by all the medical records.

Additionally, the ALJ found that plaintiff had the residual functional capacity to

perform work at all exertional levels and could perform a job with simple tasks in

which he did not work closely with others.  (T. 15).  Plaintiff contends that had the

---

[10] Plaintiff argues that his "enduring and constant paranoiac ruminations (and thoughts of revenge) along with his intrusive thoughts of suicide" would limit his concentration, persistence, and pace more than a mild level.  (Pl.'s Br. 16).  During 2001 and early 2002, plaintiff's doctors would note plaintiff's focus on past events at his job with the Postal Service (T. 203–04, 219, 221, 223, 224), but by 2004, plaintiff's doctor noted that his bipolar disorder was "in remission," (T. 218), plaintiff was in "no distress," "seemed to be stable on his medication," was "alert, oriented, relaxed and in euthymic mood," and "denied feeling suicidal or experiencing any mood swings" (T. 220).  Dr. Morog concluded after reviewing plaintiff's records that he had only mild difficulties maintaining concentration, persistence or pace, that he could "understand, execute and remember simple instructions and work-like procedures," and that plaintiff could "maintain attention and concentration for at least 2 hour intervals."  (T. 267, 273).  Dr. Shapiro, after examining plaintiff, noted that his attention and concentration were "intact."  (T. 254).

ALJ given proper weight to Dr. Narangoda's December 2009 report, the ALJ would have reached a different conclusion as to whether plaintiff's impairments rose to the level of a listed impairment and the level of plaintiff's RFC.  Having rejected the plaintiff's argument that the ALJ improperly weighed the physicians' testimony above, the court finds this argument to be without merit.  Additionally, the court points out that where, as here, the Commissioner's decision "rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."  *Galiotti v. Astrue*, 266 F. App'x. 66, 67 (2d Cir. 2008) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983).

### C.   Credibility

#### 1.   Applicable Law

During the Commissioner's five-step analysis, the ALJ must consider objective medical facts, diagnoses and medical opinions, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  However, an ALJ does not have to accept entirely the credibility of plaintiff's subjective allegations.  *Marks v. Apfel*, 13 F. Supp. 2d 319, 323 (N.D.N.Y. 1998).

The ALJ's assessment of plaintiff's credibility must be based on all of the evidence, including the consistency of plaintiff's statements and whether they comport with medical findings.  SSR 96-7p.  While subjective allegations made by a plaintiff

with a good work history may be entitled to substantial credibility, *Singletary v. Secretary of Health, Education, and Welfare*, 623 F.2d 217, 219 (2d Cir. 1980), where other substantial evidence supports the ALJ's credibility assessment, failure by the ALJ to consider plaintiff's work history is harmless error. *Jackson v. Astrue*, 1:05-CV-01061, 2009 U.S. Dist. LEXIS 105904, at *25, 2009 WL 3764221 (N.D.N.Y. Nov. 10, 2009).  If the ALJ finds plaintiff's contentions are not credible, the ALJ must state his reasons "explicitly and with sufficient specificity to enable the court to decide whether there are legitimate reasons for the ALJ's disbelief." *Smith v. Astrue*, 09-CV-921, 2011 U.S. Dist. LEXIS 32686, 2011 WL 1205132, at *9 (N.D.N.Y. March 7, 2011) (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).

## 2.    Analysis

Plaintiff contends that the ALJ erred by "ignoring" plaintiff's subjective allegations and by failing to consider plaintiff's work record.  (Pl.'s Mem. 19).  The ALJ found plaintiff's subjective allegations *partially* credible to the extent that they were consistent with plaintiff's RFC.  (T. 18).  The ALJ found that plaintiff's subjective allegations lacked some credibility because they were inconsistent with each other and with the medical evidence.  *Id.*  In addition, the ALJ noted numerous inconsistencies within plaintiff's statements.  (T. 15–18).  When questioned about these discrepancies, plaintiff stated that his memory was "not too well."  (T. 31).  For example, plaintiff repeatedly told his treating sources that he was working during

26

2007, even though his earnings report indicated that he earned no money in 2007. (*See* T. 111, 231, 232, 234, 240).

Plaintiff stated that he had difficulties while he worked for the U.S. Postal Service between 1985 and 1998, when he said that he would experience severe mood swings, and he felt that his coworkers were framing him.  (T. 33).  Plaintiff also admitted that he was abusing alcohol during this time, testifying that he would drink a case of beer or more in one sitting three to four times per week.  (T. 36–37).  The ALJ legitimately noted that plaintiff's alcohol abuse "undoubtedly adversely affected [plaintiff's] job performance."  (T. 18).

Plaintiff argues that the longitudinal medical record weighs in favor of giving credence to plaintiff's allegations of disabling limitations.  (Pl.'s Mem. 18–19).  This argument is without merit.  As stated in plaintiff's medical records, plaintiff responded well to treatment.  For example, throughout 2008, Dr. Narangoda noted that plaintiff's thought content was negative for suicidal and homicidal ideations, hallucinations and delusions.  (T. 304– 22).  Plaintiff experienced various stressors that affected his mood, but was doing well overall, with no symptoms of mania or psychosis.  (T. 328, 330, 332).

As discussed above, substantial evidence exists in the record to support the ALJ's finding that plaintiff's subjective allegations were not credible to the extent that they conflicted with the RFC as determined by the ALJ.

### D.    Past Relevant Work

#### 1.    Applicable Law

At Step 4 of the Commissioner's analysis, a claimant's past relevant work must be assessed.  20 C.F.R. § 404.1520(a)(4)(iv).  Past relevant work is work that a claimant has performed in the past 15 years and constituted substantial gainful activity.  20 C.F.R. § 404.1565(a), (b).  If the claimant can still do past relevant work, the Commissioner will find the claimant is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Where substantial evidence supports the ALJ's conclusions as to whether plaintiff's RFC allows plaintiff to perform his past relevant work, it is unnecessary to remand the case for further development of the record.  *See Stenoski v. Comm'r of Social Security*, 7:07-CV-552, 2010 U.S. Dist. LEXIS 24030, at *16–17, 2010 WL 985367 (N.D.N.Y. March 16, 2010).

#### 2.    Analysis

The ALJ found that plaintiff could return to his past relevant work as a grocery store clerk or a truck driver and was therefore not disabled.  (T. 19).  Plaintiff argues that because the ALJ found that plaintiff's unsuccessful work attempts as a truck driver and a grocery stocker did not constitute "substantial gainful activity," then these jobs should not constitute prior work to which plaintiff can return (Step 4 of the five-step evaluation process).  Plaintiff also argues that there is no substantial evidence to show that plaintiff can perform the duties required for *either* of these jobs due to his

mental condition and due to the ALJ's failure to specifically articulate the mental and physical requirements of the jobs.  (Pl.'s Mem. at 20–24).

Defendant concedes that the ALJ erred in determining that plaintiff could perform his past relevant work as a grocery clerk because did not perform this work for long enough to constitute "past relevant work" under the regulations. (Def.'s Mem. 14).  However, defendant also argues that any such error is harmless because the ALJ alternatively found that plaintiff's work as a truck driver was substantial gainful "past relevant work" to which plaintiff could return.

The harmless error standard has been applied to Social Security actions in the appropriate circumstances.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). In *Johnson v. Bowen*, the Second Circuit stated that notwithstanding a legal error, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency consideration."  *Id.* (citing *Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986)); *see also Jones v. Barnhart*, No. 02 Civ. 791, 2003 WL 941722, at *10, 2003 U.S. Dist. LEXIS 3391 (S.D.N.Y. Mar. 7, 2003) (citing cases for the proposition that harmless error rule applies to social security disability review); *Seltzer v. Comm'r of Soc. Sec.*, No. 07-CV-235, 2007 WL 4561120, at *10, 2007 U.S. Dist. LEXIS 92778 (E.D.N.Y. Dec. 18, 2007) (citing, *inter alia*, *Walzer v. Chater*, 93 Civ. 6240, 1995 WL 791963, at *9, 1995 U.S. Dist. LEXIS 21825 (S.D.N.Y. Sept. 26, 1995) for the proposition that an ALJ's error is harmless

where correct analysis would not have changed outcome).

The court notes that plaintiff obtained his commercial truck driving license in 2002, almost two years *prior* to the alleged date of onset in 2004.  Plaintiff testified that he successfully obtained a commercial drivers' license by taking a commercial driving course in 2002.  (T. 46–47).  Plaintiff did not describe the nature of the classes the driving school provided, but he did testify that he received 320 hours of instruction while attending the driving school, both classroom and on-the-road training.  (T. 46).  Plaintiff was never hired as a truck driver after he received his commercial license, but testified that the reason was that the jobs about which he inquired would have required him to be on the road for 10 to 14 days.  (T. 46–47).  Plaintiff stated that he could not be on the road that long because he had doctor's appointments, he needed to keep his condition stabilized, and his mother-in-law was ill.  (T. 47).

Prior to obtaining his commercial license, plaintiff worked as a dump truck driver, hauling things from one place to another.  (T. 38).  Plaintiff testified that he also sometimes delivered items to other sites, and would independently travel as far as Watertown, New York, as part of his job duties.  (T. 38–39).  Plaintiff testified that he worked as a truck driver from 2001 to 2003, but that he did not remember the exact dates.  (T. 38).

Plaintiff's own testimony shows that his truck driving work was conducted for a sufficient amount of time to be considered past relevant work.  The medical records

support plaintiff's testimony regarding the approximate dates of plaintiff's work. Treatment notes from that time period indicate that plaintiff stated that he worked as a truck driver through September 2003, but anticipated being laid off for the winter season soon thereafter. (T. 218). Plaintiff testified that the job ended because

> I just never went back. [The job] didn't pay well enough. When I asked [my boss] for a raise, he wouldn't give it to me and he didn't somehow believe me half the time when I was doing things, when I was doing my work, so I kind of added these up together and I said, well, you know, you don't deserve me.

(T. 38). Thus, the ALJ's finding that plaintiff's truck driving constituted past relevant work is supported by substantial evidence, and any error that the ALJ may have made regarding the grocery store position is harmless because even when the grocery store job is not considered past relevant work, plaintiff is still able to perform his truck driving job.

Plaintiff then argues that, assuming that the truck driving job is past relevant work, there is insufficient evidence to show that plaintiff has the ability to perform that work. There is no question that plaintiff can physically perform the work. He testified that "physically, I'm okay that way. . . . I can do something." (T. 42). Plaintiff's problems involve limitations on his ability to work with others. The ALJ stated that working as a truck driver "limits the claimant's interactions with the public and minimizes contact with supervisors and co-workers. (T. 19). As stated above, the medical records provide substantial evidence to support this conclusion, given the

ALJ's appropriate rejection of Dr. Narangoda's 2009 evaluation.  Thus, the ALJ's determination that plaintiff could do his past relevant work as a truck driver is supported by substantial evidence, and any error in determining that the grocery store clerk was past relevant work was harmless.

   **WHEREFORE**, based on the findings above, it is

   **RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and plaintiff's complaint be **DISMISSED**.

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file the written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15) (2d Cirl 1989)); 28 U.S. C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 18, 2011

_____

**Hon. Andrew T. Baxter**
**U.S.  Magistrate Judge**